**Pages 1 - 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

MARY CALDWELL, on behalf of  )
herself and all others       )
similarly situated,          )
                              )
       Plaintiff,           )
                              )
  VS.                          )   **No. C 19-2861 WHA**
                              )
UNITEDHEALTHCARE INSURANCE    )
COMPANY; UNITED HEALTHCARE    )
SERVICES, INC.,               )
                              )
       Defendants.          )
_____)   San Francisco, California
                                  Tuesday, September 14, 2021

**TRANSCRIPT OF TELECONFERENCE PROCEEDINGS**

**APPEARANCES**: (Via AT&T Teleconference)

For Plaintiff:
                       GIANELLI & MORRIS
                       550 South Hope Street, Suite 1645
                       Los Angeles, California 90071
          **BY:  JOSHUA S. DAVIS, ESQ.**

For Defendants:
                       HOGAN LOVELLS US LLP
                       1999 Avenue of the Stars, Suite 1400
                       Los Angeles, California 90067
          **BY:  MICHAEL M. MADDIGAN, ESQ.**
              **DAVID W. SKAAR, ESQ.**

Also Present:        Dr. Karen Herbst

Reported By:     Katherine Powell Sullivan, CSR #5812, CRR, RMR
                   Official Reporter - U.S. District Court

| | |
|---|---|
| 1 | **Tuesday - September 14, 2021                               7:48 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:** This is Civil matter 19-2861, Caldwell versus UnitedHealthcare Insurance Company. |
| 6 | Counsel, starting with plaintiff, would you please state your appearance. |
| 8 | **MR. DAVIS:** Joshua Davis on behalf of the plaintiff. |
| 9 | **MR. MADDIGAN:** Michael Maddigan, Hogan Lovells, on behalf of defendant United HealthCare. |
| 11 | **MR. SKAAR:** David Skaar, from Hogan Lovells, on behalf of defendant United Healthcare. |
| 13 | **THE COURT:** All right. And, Dr. Karen Herbst, are you on the line? |
| 15 | **DR. HERBST:** Yes, sir. |
| 16 | **THE COURT:** Thank you. Good morning to you. |
| 17 | **DR. HERBST:** Good morning. |
| 18 | **THE COURT:** And I'm the judge. We never met before, but I'm the judge in the case. |
| 20 | **DR. HERBST:** Nice to meet you, Judge. |
| 21 | **THE COURT:** My name is William Alsup. |
| 22 | **DR. HERBST:** Thank you. |
| 23 | **THE COURT:** Is anyone else on the line to make an appearance? |
| 25 | Okay. Well, the purpose of today's hearing is to |

1    introduce Dr. Herbst to the lawyers.
2         And the situation we find ourselves in is that the lawyers
3    have submitted a proposed settlement to the Court for a class
4    action, and one of the terms of the settlement concerns a
5    revision to the criteria to be used by United HealthCare with
6    respect to granting -- what's it called? -- liposuction to
7    treat lipedema.
8         And I've read the criteria myself.  I'm not a doctor, so I
9    think I need some assistance in understanding this.  The basic
10   problem is that the settlement, if approved --
11        And, Dr. Herbst, you don't understand how all this works,
12   but the rules require that the judge protect class members by
13   reviewing the terms of the deal and determining whether or not
14   it would be disadvantageous to class members in some respect,
15   or at least to evaluate that.  So that's where you come in.
16        And the concern that I have is the possibility that some
17   of these criteria would -- might, might result in an otherwise
18   deserving patient being denied lipedema treatment, or
19   liposuction.  So, now, I don't know that that's the case.
20   That's what I'm trying to find out.
21        And the problem is that the settlement terms say that if
22   the -- if the settlement is approved by the judge, meaning me,
23   that it will be binding on all class members so that a class
24   member cannot challenge these criteria as unreasonable if they
25   happen to apply for liposuction and the insurance company turns

1  them down.  Based upon the new criteria, the class member could
2  go to court to say that the criteria were not properly applied,
3  but they could not go to court and challenge the criteria.
4      So that's the -- that's why an evaluation of these
5  criteria, as applying across the board to all class members,
6  they would be stuck with these criteria, is important -- is an
7  important issue.
8      So we have located Dr. Herbst, and she has agreed to serve
9  in this capacity.  And I've sent out the instructions to the --
10 she would be appointed under Rule 706 of the Federal Rules of
11 Evidence, and the two parties would pay for her professional
12 expenses and fees on a 50 percent basis; in other words, 50/50.
13     And so today's purpose is to introduce her to the parties
14 and to ask Dr. Herbst if she -- and give the lawyers a chance
15 to ask her some questions now, with me on the line, to
16 determine if she might have any conflict.  We don't think she
17 does, but you never know.
18     So let's -- first of all, the plaintiff, you get to go
19 first and ask any questions that you have with respect to
20 conflict.
21         **MR. DAVIS:**  Thank you, Your Honor.
22     Good morning Dr. Herbst.
23     I don't have any questions for Dr. Herbst this morning,
24 but I just want to make a disclosure to the Court and to
25 defense in that our firm did hire Dr. Herbst as a consultant in

1   another case about two years ago, two and a half years ago.
2   And she was not used or disclosed as an expert witness in that
3   case.  And any more details would be work product.
4           **THE COURT:**  All right.  Dr. Herbst, is that true?
5           **DR. HERBST:**  Uhm, it very well could have been.  I
6   don't remember the case specifically, but I have participated
7   in a number of cases, primarily with another disease called
8   Dercum's Disease.
9           **THE COURT:**  Okay.  And do you know the name of the
10  firm that counsel is referring to?
11          **DR. HERBST:**  I don't recall.  I don't recall the name
12  of the firm.
13          **THE COURT:**  All right.  Let's -- in the interests of
14  disclosure, tell us, plaintiff's counsel, what the name of your
15  firm is again.
16          **MR. DAVIS:**  Gianelli & Morris.
17          **THE COURT:**  Does that ring a bell, Dr. Herbst?
18          **DR. HERBST:**  Uhm, it could.  I just -- honestly, if it
19  was a couple of years ago, I honestly just don't remember the
20  name of the firm.  I would probably more likely remember the
21  name of the patient involved.
22          **THE COURT:**  Okay.
23          **DR. HERBST:**  But I don't -- yeah.
24          **THE COURT:**  Well, all right. Counsel, can you give us
25  the name of the particular lawyer at your firm who worked on

1  this case, that case?
2       **MR. DAVIS:** Uhm, a number of lawyers worked on the
3  case.  I'm not sure who would have spoken to Dr. Herbst.  I did
4  not.
5       **THE COURT:** All right.
6       **MR. DAVIS:** I mean, the lead of the firm is Robert
7  Gianelli.  I don't know whether she spoke to him.
8       **THE COURT:** Does that name ring a bell, Dr. Herbst?
9  Gianelli?
10      **DR. HERBST:** No.  Not really.  I apologize.  It's just
11 not ringing a bell right now.
12       I mean, if I reviewed the case, I probably would remember
13 it, but I've done -- I've talked about -- or I've worked with a
14 number of, I guess, three total cases of Dercum's Disease with
15 different law firms.
16      And I just don't do a lot of interactions with the law
17 firm, mostly just with, you know, reading and working on the
18 patient.  I just don't remember the law firm.
19      **THE COURT:** Well, let me ask counsel.
20    What was the disease in question there?
21      **MR. DAVIS:** Lipedema.
22      **THE COURT:** It was lipedema?  I'm sorry?
23      **MR. DAVIS:** Yeah, I mean, I'm uncomfortable talking
24 too much about it because of work product.  It was a state
25 court case.

1     **THE COURT:**  Well, it's important to me to know --
2     **MR. DAVIS:**  It was lipedema.
3     **THE COURT:**  Do you remember that, Dr. Herbst?  It was
4  lipedema?
5     **DR. HERBST:**  I don't remember that I worked on a case
6  of lipedema.  I don't even remember the case.
7     **THE COURT:**  Well, this is a -- I think we need to get
8  to the bottom of this.
9     **DR. HERBST:**  Okay.
10    **THE COURT:**  So what -- I think you need to disclose --
11 the law firm needs to tell me the name of the plaintiff in that
12 case.  That's public record.
13    **MR. DAVIS:**  I could tell you the name of the case.  It
14 was Manuel versus Anthem.
15    **DR. HERBST:**  Manual versus Anthem.
16    **THE COURT:**  What was the first name of Manuel?
17    **MR. DAVIS:**  I believe her name was Jessica.
18    **THE COURT:**  Jessica Manuel versus Anthem.
19    **MR. DAVIS:**  I'm double-checking that.
20    **DR. HERBST:**  Wow.
21    **THE COURT:**  So -- and what was the year that she was
22 retained in that case?
23    **MR. DAVIS:**  I think it was 2019.
24    **THE COURT:**  Okay.
25    **MR. DAVIS:**  I'm double-checking everything.  Hold on a

1   second so I can give you accurate information.
2          Yes, it was 2019.
3          **THE COURT:**  And you had a -- some kind of written
4   agreement with Dr. Herbst, or at least an exchange of emails
5   that constituted an agreement?
6          **MR. DAVIS:**  No, there was a written agreement.
7          **THE COURT:**  Was there a written report?
8          **MR. DAVIS:**  No.  She was not -- it was state court, so
9   there were no reports.  And there was no designation.  She was
10  just retained as a consultant.
11         **THE COURT:**  I see.
12         **MR. DAVIS:**  Not designated, did not testify.
13         **THE COURT:**  Okay.  All right.
14      So, Dr. Herbst, I think we need to know what the nature of
15  that was and whether you remember it.
16         **DR. HERBST:**  Okay.
17         **THE COURT:**  So what do you need to do in order to
18  refresh your memory?
19         **DR. HERBST:**  I would need to find the emails.
20      It doesn't sound like I did very much on that case, which
21  may be why I don't remember it very well.  But I could
22  definitely look through material that I might have saved.
23      You know, I can't guarantee you that I would have saved
24  every -- anything.  You know, if it was a couple of years ago,
25  then I might have shredded it.

1    **THE COURT:** Sure. No. Maybe you still have some
2    emails that -- or work product of some sort that would cause
3    you to refresh your memory.
4    **DR. HERBST:** Yes, sir. Yes. I can definitely look
5    for that.
6    **THE COURT:** Have you ever done any other work for that
7    same law firm?
8    **DR. HERBST:** I do -- I don't think so. And I know
9    that I -- the most involvement I've ever had with law firms was
10   on cases of people who had Dercum's Disease and not lipedema
11   per se.
12       And if I was retained as a consultant but it wasn't really
13   used, I don't think I did enough to remember that case.
14   **THE COURT:** That's entirely possible, but I would like
15   for you to see if your memory can be refreshed.
16   **DR. HERBST:** Yep, yep.
17   **THE COURT:** All right. Let me ask counsel. Are there
18   any other instances in which your firm has run across
19   Dr. Herbst?
20   **MR. DAVIS:** No, Your Honor. That's just that one
21   case.
22   **THE COURT:** Okay. And how about on the defense side,
23   the United HealthCare side, what is the name of your law firm?
24   **MR. MADDIGAN:** Hogan Lovells.
25   **THE COURT:** And has your law firm ever used Dr. Herbst

1  in some way?
2         **MR. MADDIGAN:**  I don't believe so, Your Honor.  Not
3  that we've identified.
4         **THE COURT:**  All right.  And, Dr. Herbst, have you ever
5  worked with that law firm?
6         **DR. HERBST:**  No.  No, Your Honor.
7         **THE COURT:**  Have you ever worked with United
8  HealthCare?
9         **DR. HERBST:**  No.  Obviously, as a physician I have,
10 but not in a court case of any kind.
11        **THE COURT:**  All right.  Okay.  Well, let's -- one
12 follow-up -- I'm sorry, somebody is going to say something.  Go
13 ahead.
14        **MR. MADDIGAN:**  Excuse me, Your Honor.  I'm sorry.
15 This is Michael Maddigan.
16    I do have some questions at the appropriate time, so I
17 just wanted to make sure --
18        **THE COURT:**  Yeah, I was going to turn to that right
19 now.
20    So one follow-up item is that we will let Dr. Herbst try
21 to refresh her memory about the matter with the Gianelli firm
22 involving Jessica Manuel.
23    But go ahead, on the Hogan Lovells side, please, what are
24 your further questions?
25        **MR. MADDIGAN:**  Thank you, Your Honor.

1        Good morning, Dr. Herbst.  This is Mike Maddigan.  I have
2    a few questions about your prior interactions with United.
3        The first is, did you attend a teleconference meeting with
4    the United medical policy team in May 2019, to discuss
5    liposuction for lipedema?
6            **DR. HERBST:**  I believe I did, yes.
7            **MR. MADDIGAN:**  And did you attend that with a group of
8    other doctors who perform lipedema surgery?
9            **DR. HERBST:**  Yes, and with -- if my memory serves me
10   correctly, that was also with another lawyer, Carrie Rigo.
11           **MR. MADDIGAN:**  Okay.  And Ms. Rigo is a well-known
12   liposuction advocate; is that right?
13           **DR. HERBST:**  Correct.
14           **MR. MADDIGAN:**  And you attended, also, with Jaime
15   Schwartz, who you currently work with at Total Lipedema Care;
16   is that correct?
17           **DR. HERBST:**  Correct.
18           **MR. MADDIGAN:**  Was the purpose of that meeting to
19   advocate for a change in United's coverage position regarding
20   liposuction to treatment lipedema?
21           **DR. HERBST:**  That's my understanding.
22           **MR. MADDIGAN:**  What's your relationship with Ms. Rigo?
23           **DR. HERBST:**  I do not have a relationship with
24   Ms. Rigo right now.  She has decided not to work with myself or
25   Dr. Schwartz anymore.  There was a falling-out between her and

1  Dr. Schwartz, and I was included in the package.  So I have not
2  interacted with Ms. Rigo for at least a year, let's say.
3          **MR. MADDIGAN:**  But leading up to -- and it sounds like
4  after that meeting you did interact with her?
5          **DR. HERBST:**  Yes, yes.
6          **MR. MADDIGAN:**  Okay.
7          **DR. HERBST:**  She was very helpful in, you know,
8  getting some language correct on a letter of medical necessity
9  that I wrote.  And she helped, you know, review and edit it,
10 and then I reedited it until I was satisfied.
11    It was just nice to have someone in the legal profession
12 just to review the letter to make sure I was saying things
13 correctly and I wasn't missing anything.  And I wrote a couple
14 of things for her, but that was it.  I have never been in a law
15 case with her.
16         **MR. MADDIGAN:**  Okay.  You alluded to something that I
17 also -- have you ever attended any other meetings -- well, you
18 alluded to something else that I wanted to ask you about
19 briefly, as well.
20         **DR. HERBST:**  Uh-huh.
21         **MR. MADDIGAN:**  And that is your work for United
22 members.  It sounds like you've submitted letters for United
23 members requesting treatment of liposuction for lipedema.  Is
24 that correct?
25         **DR. HERBST:**  Yes.  So I have a standard letter of

1  medical necessity that I provide to patients, and I don't
2  specifically provide a letter for United HealthCare.  I provide
3  it to my patient, and they can use that at their discretion to
4  submit to whatever insurance they have.
5       So, to me, it doesn't even matter what insurance they
6  have.  I just provide them a letter.
7           **MR. MADDIGAN:**  And have you ever written any letters
8  supporting United members in their appeals?
9           **DR. HERBST:**  No.  I'm not involved in an appeal
10 process.  No, I have not done that.  Not a specific appeal
11 letter.
12          **MR. MADDIGAN:**  Okay.  The -- you're currently
13 affiliated with an entity called Total Lipedema Care; is that
14 correct?
15          **DR. HERBST:**  That's correct.
16          **MR. MADDIGAN:**  And are you employed there?
17          **DR. HERBST:**  I am.  I'm an independent contractor.
18          **MR. MADDIGAN:**  Okay.  The website of Total Lipedema
19 Care says, on the home page in a banner "We believe lipedema
20 should be covered by insurance."
21      Do you believe that insurance should cover liposuction for
22 lipedema in all cases?
23          **DR. HERBST:**  I -- I will tell you that I do struggle a
24 little bit with some of my patients because they -- you know,
25 unfortunately, I think there is an epidemic of obesity.  And I

1  really fight for my patients to make sure that they don't have
2  metabolic complications or other things that we can control
3  prior to getting liposuction.
4      So I feel like that's a little bit of a frustration of
5  mine that I don't feel we have very good data in the
6  United States on liposuction for lipedema.  And we do have the
7  data from Germany, but that's an entirely different country and
8  an entirely different population.
9      And so I -- my goal is to look at the person as a whole
10 and to figure out how can I best serve this patient so whatever
11 treatment recommendations we give to them, they're solid and
12 they last.
13     Because my concern is -- we did publish a paper on -- a
14 questionnaire study on liposuction for lipedema, and many of
15 the women said that their fat grew back in the area where they
16 had liposuction and, also even outside of that area, which has
17 also been reported in other cases of liposuction in the
18 literature.
19     And my question is why?  And, you know, why are we -- why
20 are we doing this expensive, invasive procedure if it's just
21 going to grow back?  So, you know, what are the things that we
22 can do to, you know, prevent that and to make sure that our
23 patients are the best patient for the liposuction procedure.
24     I also don't really support liposuction for obesity.  You
25 know, I find that to be a cosmetic procedure, and that's why I

1    do what I do.
2         So I guess my answer for you is, no, I do not think that
3    every woman who has some lipedema tissue on her body is a
4    candidate for liposuction, and I think there has to be a
5    medically necessary reason.  There has to be pain.  There has
6    to be swelling.  There has to be a problem with mobility and
7    others.
8         And I'm currently working with a physician in Spain,
9    because they have a different way of looking at lipedema, and,
10   you know, trying to figure out, you know, if they -- they can
11   offer me something that I can grab onto to make outcomes for
12   whatever I recommend for my patients work better and longer
13   lasting.
14          **MR. MADDIGAN:**  Thank you.  I have just, I think, two
15   other quick questions, or maybe a quick area.
16        The first is, you -- I believe you recently coauthored a
17   paper, and maybe this is what you were just referencing, called
18   "Standard of Care for Lipedema in the United States."  Is that
19   right?
20          **DR. HERBST:**  Correct.
21          **MR. MADDIGAN:**  And are you -- would you be able to
22   find appropriate a policy with criteria that did not perfectly
23   line up with what you describe as the standard of care?
24        Does that make sense?
25          **DR. HERBST:**  Yeah.  No, that makes perfect sense.  And

1   I already feel like our publication is outdated just because
2   things are happening so quickly.  And that was a true consensus
3   document, so I was not the sole writer of that document.
4        And I let the specialists in their area take control of
5   their section of that paper.  And so I did not write
6   everything, you know, and we just went with the consensus.
7        So I would say that not everything in that standard of
8   care is written in stone.  It can't be, because we don't even
9   understand the true path of physiology of lipedema.
10           **MR. MADDIGAN:**  Okay.  Great.  Thanks.
11       I think the last question I have is, have you had any
12  prior contact with the plaintiff in this case, Mary Caldwell?
13           **DR. HERBST:**  I don't -- I don't know Mary Caldwell.
14           **MR. MADDIGAN:**  And you don't remember having any
15  contact with her?
16           **DR. HERBST:**  No.  I -- I have -- to my knowledge -- I
17  mean, at least I knew her name -- I have not had any contact
18  with her.
19           **MR. MADDIGAN:**  Okay.  Thank you very much, Doctor.  I
20  appreciate you answering my questions.
21       Thank you, Your Honor, for letting me ask them.
22           **THE COURT:**  Sure.
23       Dr. Herbst, now, it's important that-- is there a way for
24  you to check?  You kind of equivocated there.  Are you certain
25  that you've never had any contact with the plaintiff in this

```
 1  case, Mary Caldwell?
 2          DR. HERBST:  Yes, I did check that.  I searched my
 3  computer, I searched my current practice, and I have no -- I
 4  mean, I try not to keep patient information on my computer,
 5  but -- and I have moved -- you know, I retired from the
 6  University of Arizona in February of 2020, so I do not have any
 7  of that information on hand.
 8          THE COURT:  All right.
 9          DR. HERBST:  But I don't have anything that I could
10  find.
11          THE COURT:  Okay.  Have you read the document that I
12  sent out called "Instructions for Rule 706, Expert
13  Appointment"?  Did you read that document?  It's about two
14  pages long, three pages long.
15       Dr. Herbst?
16          DR. HERBST:  Yes.  I -- I did read -- I don't know if
17  the document was from you, but I did read a document on this
18  case.
19          THE COURT:  Well, it's probably -- if you see anything
20  in there that gave you -- let me ask my law clerk.
21       Did you provide that to Dr. Herbst?
22          LAW CLERK:  No.
23          THE COURT:  All right.  We'll have to get you that
24  separately then, I guess.  We didn't give you that.
25          DR. HERBST:  Okay.
```

1  **THE COURT:** What you need to do is to let us know --
2  let my law clerk know the answer to the question about the work
3  for the Gianelli firm.
4  **DR. HERBST:** Yes.
5  **THE COURT:** That -- what you can dig up from your own
6  records, try to do that today. And then I will pass that on to
7  both sides.
8       And then the deadline for any objection based on conflicts
9  or anything else is September 21. So --
10 **DR. HERBST:** Okay.
11 **THE COURT:** -- counsel should keep that in mind as we
12 go forward. Today is number what? Number 14. So it's about a
13 week from now. Okay.
14      Counsel, I'm going to terminate the discussion now and let
15 you move on to your next case unless you have something else
16 that needs to be addressed now.
17 **MR. DAVIS:** This is Josh Davis for the plaintiff.
18      This is just more information to help Dr. Herbst on the
19 other case that she was going to double-check on. And that
20 was, looks like the consultancy was in the tail end of 2018
21 going into 2019 for Jessica Manuel.
22 **DR. HERBST:** Okay.
23 **THE COURT:** So 2018 going into 2019. Thank you.
24      All right. Anything else?
25      Again, Dr. Herbst, thank you. We'll talk soon. Bye-bye.

1     **DR. HERBST:**  Thank you, Your Honor.
2     **THE COURT:**  Everyone can hang up.
3     **MR. MADDIGAN:**  Thank you, Your Honor.
4     (At 8:17 a.m. the proceedings were adjourned.)
5                          - - - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Wednesday, September 15, 2021

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter